# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN GREENBERG, derivatively on behalf of LIFEMD, INC., | ) Case No. |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| JUSTIN SCHREIBER, JOHN STRAWN, JOSEPH V. DITROLIO, ROBERTO SIMON, JOAN LAROVERE, WILLIAM FEBBO, CALUM MACRAE, and MARC BENATHEN, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| -and- | ) |
| | ) |
| LIFEMD, INC., a Delaware Corporation, | ) |
| | ) |
| Nominal Defendant. | ) |
| | ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jonathan Greenberg ("Plaintiff"), derivatively on behalf of LifeMD, Inc. ("LifeMD" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Johnston v. LifeMD, Inc. et al.*, Case No.: 1:25-cv-04761 (E.D.N.Y.) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of LifeMD, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least May 7, 2025, to August 5, 2025 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed LifeMD to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.      LifeMD is an American telehealth company that offers virtual medical consultations with doctors and nurse practitioners, providing treatment plans and prescription medications directly to patients without the need for in-person visits.

3.      LifeMD launched a men's health-focused telehealth brand called RexMD.  LifeMD also offers personalized GLP-1 weight loss medications for obesity, including Wegovy and Zepbound.

4.      On May 6, 2025, the Company issued heightened 2025 guidance.  However, the Company did not properly account for increased customer acquisition costs in its RexMD business and those associated with the GLP-1 medications.

5.      The Company overstated LifeMD's business prospects related to RexMD and sales of GLP-1 medications weight loss medications.  Additionally, the Company overstated LifeMD's competitive position.

6.      Days before lowering its full-year guidance, company executives sold millions of dollars of LifeMD stock at artificially inflated prices.

7.     On August 5, 2025, the Company issued a press release that it was revising its full year 2025 guidance for revenue and adjusted EBITDA due to challenges facing its RexMD business.

8.     At its Q2 2025 Earnings Call, the Company admitted that the full-year guidance was down as a result of issues with RexMD customer acquisition costs.

9.     On this news, the price of LifeMD common stock fell $5.31 per share, or 44.8%, to close at $6.53 on August 6, 2025.

10.     Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A.     Plaintiff

11.     Plaintiff is a current shareholder of LifeMD and has continuously held LifeMD stock during all times relevant hereto, and is committed to retaining LifeMD shares through the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of LifeMD and its shareholders in enforcing its rights.

### B.     Nominal Defendant

12.     Nominal Defendant LifeMD is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 236 Fifth Avenue, Suite 400, New York, NY 10001. LifeMD common stock trades on the Nasdaq Global Market under the ticker symbol "LFMD".

**C.    Individual Defendants**

13.     Defendant Justin Schreiber has served as CEO and the Chairman of the Board of Directors of the Company since 2018.

14.     Defendant John Strawn has been a director of the Company since 2011.

15.     Defendant Dr. Joseph DiTrolio has been a director of the Company since 2014.

16.     Defendant Roberto Simon has been a director of the Company since 2020.

17.     Defendant Dr. Joan LaRovere has been a director of the Company since 2023.

18.     Defendant William Febbo has been a director of the Company since 2023.

19.     Defendant Dr. Calum MacRae has been a director of the Company since 2024.

20.     Defendants Schreiber, Strawn, DiTrolio, Simon, LaRovere, Febbo and MacRae are herein referred to as "Director Defendants."

21.     Defendant Marc Benathen has served as CFO of the Company since 2021.

22.     Defendants Schreiber and Benathen are herein referred to as "Officer Defendants."

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as

to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.      Venue is proper in this court under 28 U.S.C. § 1391, because a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.      Company Background

27.      LifeMD is a publicly traded telehealth company that provides virtual healthcare services, connecting patients with licensed providers for various conditions including primary care, sexual health, hormone therapy, and weight management. The company offers on-demand consultations, prescription services, and at-home diagnostics through its platform, which includes brands like RexMD, a men's health-focused telehealth brand.  LifeMD also offers personalized GLP-1 weight loss medications for obesity, including Wegovy and Zepbound.

### B.      LifeMD's False and Misleading Statements

28.      On May 6, 2025, LifeMD issued a press release entitled "LifeMD Reports First Quarter 2025 Results and Raises Full-Year 2025 Guidance" (the "Q1 Release").

29.      The Q1 Release quoted Defendant Schreiber:

> LifeMD had an outstanding first quarter that demonstrated the power of our platform, the need for our services and the accelerated growth trajectory of the business as we achieved our first-ever quarter of GAAP profitability well ahead of expectations. During the quarter we expanded across all service areas, and the performance of our weight management program underscored our success as it is now expected to exceed topand bottom-line expectations for the full year. The launch of our men's hormone therapy offering, and recent acceptance of Medicare are also off to strong starts and continue to diversify our already leading telehealth platform.

> * * *

> Our recently announced strategic collaborations with both LillyDirect and NovoCare continue to generate momentum by allowing us to offer more

convenient and affordable access to branded GLP-1 medications. These collaborations make LifeMD the only telehealth provider in the U.S. that offers synchronous care and cash-pay access to both Wegovy® and Zepbound®. In addition to the continued success of our existing telehealth platforms, we recently announced key hires in the mental and hormonal health verticals and the acquisition of important assets in behavioral health and women's health. These are two strategic areas with significant unmet clinical need in the marketplace and within our existing patient population.

30.     The Q1 Release also quoted Defendant Benathen:

LifeMD had an exceptionally strong first quarter with top- and bottom-line growth both ahead of our expectations. Telehealth revenue achieved 70% year-over-year growth on a standalone basis, while our telehealth adjusted EBITDA increased to $5.3 million from a loss of $1.3 million in the year-ago period. We also achieved positive GAAP net income for the first time[.] We are raising our full-year 2025 guidance to reflect our strong performance to date for both revenue and adjusted EBITDA. We now expect total revenues in the range of $268 to $275 million, up from $265 to $275 million, and adjusted EBITDA in the range of $31 to $33 million, up from $30 to $32 million.

31.     The Q1 Release stated that "[f]or the full year 2025, due to the outperformance of its telehealth business in the first quarter the Company is raising its guidance to" the following figures:

• Total revenues in the range of $268 million to $275 million, up from previous guidance of $265 million to $275 million.

• Telehealth revenue in the range of $208 million to $213 million, up from $205 million to $213 million.

• Adjusted EBITDA in the range of $31 million to $33 million, up from $30 million to $32 million.

• Telehealth adjusted EBITDA is now forecast to exceed $21 million, up from approximately $20 million previously.

32.     On the same day, LifeMD conducted its Q1 2025 Earnings Call (the "Q1 Call"). Defendant Benathen confirmed on the Q1 Call that LifeMD was raising its guidance for 2025 "due to the outperformance of our Telehealth business to-date."

33.    Defendant Schreiber made the following statements on the Q1 Call:

Now I'll turn to our virtual primary care platform. As recently announced, we've established strategic collaborations with LillyDirect and NovoCare to improve access to GLP-1 medications for weight management patients without insurance coverage. These partnerships reflect the growing recognition of our patient-first model and underscore our ability to streamline access to transformative therapies.

LifeMD is now the only virtual care provider offering synchronous consults integrated with both NovoCare and LillyDirect, enabling seamless access to Wegovy and Zepbound. Combined with our direct-to-patient pharmacy, specialized nationwide provider network and pharmacy benefits infrastructure, we believe we've created a category-defining competitive moat in virtual obesity care. It's worth noting that we expect to do exactly the same thing in many other verticals in the years to come.

\* \* \*

Our RexMD brand continues to perform exceptionally well, with consistent growth in both revenue and active patient count, further reinforcing its position as a category leader in men's health.

As we previously guided, we continue to expand Rex beyond its original focus on sexual health into larger, high-demand verticals, including weight management, behavioral health, insomnia and hormone replacement therapy.

Our newly launched HRT program is off to a strong start with early adoption, exceeding expectations and offering valuable insights into this fast-growing category. Notably, more than 40% of new HRT patients are existing RexMD patients already engaged in another care subscription.

Later this year, we plan to introduce LifeMDPlus and other synchronous care offerings to RexMD's 180,000 active patients, unlocking a significant cross-care opportunity across our ecosystem.

\* \* \*

As we conclude our prepared remarks, I want to underscore how energized we are by LifeMD's strong start to 2025. Our first quarter performance reflects disciplined execution against our strategic priorities and the early traction we're seeing across key initiatives gives us strong confidence in our trajectory for the remainder of the year.

The programs we've launched, including the expansion of our benefits infrastructure, strategic collaborations with GLP-1 manufacturers, new

RexMD offerings, and our entry into the women's and behavioral health space are all aligned with our near-term vision to build a trusted, vertically integrated marketplace for healthcare services, prescription medications and over-the-counter healthcare products.

34.    The Q1 Call included the following exchange with analysis:

Analyst: Hi. Congrats on the great quarter and thank you for taking the questions. So first just looking at your guidance for Telehealth, like raising the lower end for revenues following a strong quarter. This revenue like you're spending Telehealth to be roughly flat sequentially. Is this just being conservative or there's some headwinds that you're anticipating that will limit your ability to grow sequentially.

Defendant Benathen: Yeah. No. It's not that there's headwinds. I mean there's some timing in the revenue that we have. I mean, we tend to take a relatively conservative view to revenue. We do normally expect and see that aspects of the Rex business and sexual health tend to be a little bit softer seasonally in Q2 than they are in Q1, which is what historically we've seen, particularly from new acquisition standpoints. We've baked that into our model also. But all that's pretty consistent with what we've seen in the past. Obviously, there's tremendous growth year-on-year and that's essentially how we're managing the business versus just managing for sequential growth every single quarter.

35.    The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that: (1) Defendants materially overstated LifeMD's competitive position; (2) Defendants were reckless in raising LifeMD's 2025 guidance because they had not properly accounted for rising customer acquisition costs in LifeMD's RexMD segment, as well as for its sales of GPL-1 weight loss mediactions; and therefore, (3) Defendants' statements about LifeMD's business, operations, and prospects were materially false and misleading.

36.    Egregiously, LifeMD's executives sold millions of dollars' worth of LifeMD shares at an artificially raised price.

37.    Specifically, on June 13, 2025, Stefan Galluppi, LifeMD's Chief Innovation Officer, sold 85,000 shares of LifeMD stock at an artificially raised price, raising $1,079,500.

38.     Thereafter, on August 1, 2025, four days before the Company announced that it was lowering its full-year guidance, Defendant Schreiber sold 175,000 shares of LifeMD stock at artificially inflated prices, raising $1,821,750 in the process.

   **C.    The Truth is Revealed**

39.     On August 5, 2025, after the close of the market, the Company issued a press release entitled "LifeMD Reports Second Quarter 2025 Results." This announcement quoted Defendant Benathen stating that due to "some temporary challenges facing our Rex MD business," which he claimed were "largely resolved," that the Company was "revising our full year 2025 guidance for revenue and adjusted EBITDA to reflect the full-year impact of these issues, while still anticipating strong year-over-year growth in both metrics."

40.     The Announcement stated the following about what financial ranges the Company now expected for 2025:

> • Total revenue in the range of $250 million to $255 million, compared with the previous guidance of $268 million to $275 million.
>
> • Telehealth revenue in the range of $195 million to $200 million, compared with $208 million to $213 million previously.
>
> • Adjusted EBITDA in the range of $27 million to $29 million, compared with $31 million to $33 million previously.
>
> • Telehealth adjusted EBITDA is now forecast to be in the range of $14 million to $16 million, down from $21 million previously.

41.     On August 5, 2025, after the market closed, the Company held its Q2 2025 Earnings Call (the "Q2 Call"), during which Defendant Schreiber revealed:

> Our weight management business remains robust, consistently attracting over 400 new patient sign-ups per day. Notably, we've seen a significant increase in patients accessing branded therapy options through our platform. Given current trends and the improvements we expect to see in pricing and insurance coverage, we expect that by year-end, the vast majority of new

patients will be on an insurance covered GLP-1 therapy, an affordable cash-based therapy or one of our oral prescription therapies for weight loss.

We continue to invest in improving the care platform that supports our weight management program. This decision is validated by the fact that we are seeing a growing number of weight management patients using our platform to access nonweight-related health care services and products. While our weight management segment did outperform our second quarter guidance plan for this segment, weight management has been impacted by a higher-than-anticipated refund rate driven by patients either lacking insurance coverage for their medications or being unable to afford the out-of-pocket cost of branded therapies.

Although this is a near-term headwind, we are actively enhancing our new patient intake process to include real-time benefit verification and other key improvements. These updates are designed to significantly improve the patient experience and drive higher conversion rates on to therapy. As part of these efforts, we are expanding access to a broader range of oral generic weight loss medications and adding liraglutide as a covered option. We remain highly confident in the long-term opportunity within prescription weight management. This is a large and underserved market, and we believe the steps we're taking will further strengthen our leadership position despite the temporary challenges.

* * *

Turning to Rex. We experienced a challenging second quarter, primarily due to temporarily elevated customer acquisition costs in the highly competitive ED market. However, we have since adjusted our marketing and product strategies and early third quarter data suggests a return to healthier customer acquisition levels. We remain confident in RexMD's long-term growth trajectory, especially as we continue to broaden our offerings into hormone replacement therapy, personalized compounded treatments for ED and hair loss as well as additional men's health categories.

42.    In response to questions for more information concerning the acquisition costs,

Defendant Schreiber stated:

[. . .] I'll just add, like remember, we [had an enormous transition], right, this past quarter with the weight management business, which just really required a lot of energy from almost everybody in the organization. And some of the -- we did see -- we obviously saw these changes [in the competitive environment], but some of it was just think we took our eye off the ball for a little bit, and it's -- we should have gotten this thing back online a little quicker, and we didn't. But again, as we try to -- as we communicated

in the -- on the call earlier, like we feel really good about where the business is. There's a lot of exciting kind of new product opportunities for RexMD and we really want to communicate that this isn't something that we're going to -- we think we -- people should be concerned about going forward.

43.    Defendant Benathen also made statements during the Q2 Call:

As Justin noted, our long-term financial outlook remains strong. Weight management, though experiencing some impact from higher refund rates from patients without coverage or for whom discounted cash pay pricing is still inaccessible, performed ahead of guidance plan in the second quarter. New subscribers for weight management continued at strong levels and regularly exceeded 400 new patient sign-ups per day. WorkSimpli maintained its strong bottom line performance with quarterly adjusted EBITDA of nearly $3.7 million on a stand-alone basis. Our quarterly results were mostly impacted by temporary performance challenges impacting our RexMD business, which are largely behind us.

44.    Defendant Schreiber also stated that "we weren't satisfied with our overall performance[.]"

45.    In an exchange with an analyst, Defendant Benathen confirmed that the full-year guidance was down as a result of RexMD customer acquisition costs, but represented that the issues had been resolved:

Analyst: Just kind of as a follow-up to the last question. I just want to make sure I fully understand it. So the full year guide down, that's totally related to the dynamics faced with the RexMD business despite the fact that you guys now have that resolved. Just want to get an understanding of any impact that we would see from that in Q3 and then more recently in Q4.

Benathen: Yes. So the majority of it is related to that. There's a small proportion, as you mentioned, in the short term, there's some higher refund rates on the weight management patients. We're talking a few percentage points higher. That was a small proportion of the changes, which we've built into the Q2 and Q3 -- sorry, the Q3 guide.

But the vast majority of it was the impact from performance in Rex in Q2 and then the downstream impact associated with less new subscribers that came in the door in Q2, retaining those people throughout the year and slightly softer sales performance than we had historically seen. Obviously, we're building back.

> But I'd say right now in terms of sales per day, we're at about 85% to 90% of where we've been historically, which is a big improvement over where we had been in the middle of Q2. But all of that is baked into the guidance. Now we've not assumed any potential complete rebound in Rex within that guidance. So we think we've taken a prudent point of view on that.

46.     On this news, the price of LifeMD common stock fell $5.31 per share, or 44.8%, to close at $6.53 on August 6, 2025.

### D.    Defendants' Misconduct Has and Continues to Harm the Company

47.     As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

48.     The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties LifeMD's reputation and goodwill have also been damaged by the Defendants' misconduct. The Board failed to ensure that it conducted a thorough investigation into the effectiveness of the Company's internal controls over financial reporting.

49.      The Company has already incurred and will continue to incur costs to remediate the deficiencies in its internal controls over financial reporting, as well as to defend against the Securities Class Action.

### E.    LifeMD Issues False and Misleading Proxy Statements

50.     In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on April 28, 2025 (the "Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

51.     The Director Defendants drafted, approved, reviewed, and/or signed the Proxy before they were filed with the SEC and disseminated to LifeMD's stockholders. The Director Defendants negligently issued materially misleading statements in the Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxy's allegations and related claims.

52.     In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the Proxy. The Proxy stated:

**Board Leadership Structure and Role in Risk Oversight**

Justin Schreiber serves as both the Chairman of our Board and our Chief Executive Officer. We believe having a single person serve as both Chair of our Board and our Chief Executive Officer is the most effective leadership structure for us at this time.

As Chairman of the Board, Mr. Schreiber's key responsibilities include facilitating communication between our Board and management; assessing management's performance; managing board members; preparation of the agenda for each board meeting; acting as Chairman of board meetings and meetings of our Company's stockholders; and managing relations with stockholders, otherstakeholders, and the public.

Our Board does not currently have a designated lead independent director. We are aware of the potential conflicts that may arise when an interested director is Chairman of the Board, but we take steps to ensure that adequate structures and processes are in place to permit our Board to function independently of management. For example, the directors are able to request at any time a meeting restricted to independent directors for the purposes of discussing matters independently of management and are encouraged to do so should they feel that such a meeting is required.

The Board will continue to exercise its judgment on an ongoing basis to determine the optimal Board leadership structure that the Board believes will provide effective leadership, oversight, and direction, while optimizing

the functioning of both the Board and management and facilitating effective communication between the two. The Board may modify its leadership structure in the future as it deems appropriate.

Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities. Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management policies and strategy, and the most significant risks facing us, including cybersecurity, and oversees the implementation of risk mitigation strategies by management. Our Compensation Committee is responsible for overseeing risks related to our compensation programs. Our Nominating and Corporate Governance Committee is responsible for overseeing risks related to our corporate governance policies and practices. Our Board is also apprised of particular risk management matters in connection with its general oversight role, including approval of corporate matters and significant transactions.

53.    The Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements.  Specifically, (1) Defendants materially overstated LifeMD's competitive position; (2) Defendants were reckless in raising LifeMD's 2025 guidance because they had not properly accounted for rising customer acquisition costs in LifeMD's RexMD segment, as well as for its sales of GPL-1 weight loss mediactions; and therefore, (3) Defendants' statements about LifeMD's business, operations, and prospects were materially false and misleading.

54.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

### F.    The Board Breached its Fiduciary Duties

55.    As officers and/or directors of LifeMD, the Defendants owed LifeMD fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage LifeMD in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of LifeMD, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

56.    Defendants, because of their positions of control and authority as directors and/or officers of LifeMD, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding LifeMD's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

57.    To discharge their duties, the officers and directors of LifeMD were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and LifeMD were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

58.     The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

59.     The Board's Audit Committee is tasked with overseeing LifeMD's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of LifeMD's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Monitoring the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;

- Reviewing areas of potential significant financial risk to the Company;

- Monitoring compliance with legal and regulatory requirements;

- Making recommendations to the Board;

- In consultation with the management, the independent auditors, and the Company's principal accounting officer, considering the integrity of the Company's financial reporting processes and controls, including any major issues as to the adequacy of the Company's internal controls, and any special steps adopted in light of any identified material control deficiencies;

- Discussing significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures;

- Reviewing significant findings prepared by the independent auditors and the Company's principal accounting officer together with management's responses;

- Conducting an annual risk review with respect to the matters within the role and the responsibilities of the Committee; and

● Periodically reviewing the Committee's own performance.

60.      In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Simon, Strawn, and LaRovere (the "Audit Committee Defendants") conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

61.      In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

62.      The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on LifeMD.

## DERIVATIVE ALLEGATIONS

63.    Plaintiff brings this action derivatively in the right and for the benefit of LifeMD to redress injuries suffered by LifeMD as a direct result of the Director Defendants' breaches of fiduciary duty.  LifeMD is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

64.    Plaintiff will adequately and fairly represent the interests of LifeMD in enforcing and prosecuting the Company's rights.

65.    Plaintiff was a stockholder of LifeMD at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a LifeMD stockholder.

## DEMAND FUTILITY ALLEGATIONS

66.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

67.    The LifeMD Board currently has seven members: Defendants Schreiber, Strawn, DiTrolio, Simon, LaRovere, Febbo, and MacRae.

68.    Plaintiff has not made any demand on LifeMD's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

69.    The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust

and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

70.     The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of LifeMD. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

### A.     Demand is Excused as to Defendant Schreiber

71.     Defendant Schreiber isthe co-founder of LifeMD and is the Company's CEO. Defendant Schreiber received compensation of $1,063,459.00 in 2024. Defendant Schreiber depends on LifeMD for his income. In addition, LifeMD stated in the Schedule 14A Proxy Statement filed with the SEC on April 28, 2025 that Defendant Schreiber is not independent pursuant to NYSE rules.

72.     Defendant Schreiber served as the Chairman of the Board of Directors of the Company during the Relevant Time Period. As a director, Defendant Schreiber had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Schreiber was also required to act in good faith and with due

diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

73.    Defendant Schreiber failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor LifeMD's controls, Defendant Schreiber failed to protect corporate assets.

74.    Defendant Schreiber was an active participant in the misconduct described above. Defendant Schreiber signed the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Schreiber made false and misleading statements concerning the Company's failure to account for rising customer acquisition costs in LifeMD's RexMD segment, as well as for its sales of GPL-1 weight loss medications. Defendant Schreiber therefore faces a substantial likelihood of liability.

75.    Defendant Schreiber also sold 175,000 shares of LifeMD stock at artificially inflated prices, raising $1,821,750, on August 1, 2025 - days before the Company announced that it was lowering its full-year guidance.

76.    Defendant Schreiber is a named defendant in the Securities Class Action. Thus, Defendant Schreiber faces a substantial likelihood of liability.

## B.    Demand is Excused as to Defendant Strawn

77.    Defendant Strawn served as a director of the Company during the Relevant Time Period. As a director, Defendant Strawn had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Strawn was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

78.     Defendant Strawn failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor LifeMD's controls, Defendant Strawn failed to protect corporate assets.

79.     According to the Proxy, Defendant Strawn received $451,902.00 in compensation in connection with his role as a Company director. Accordingly, Defendant Strawn cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

80.     Defendant Strawn served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving LifeMD's Forms 10-Q and 10-K filed during the Relevant Period. Defendant Strawn was thus responsible for knowingly or recklessly allowing the improper statements related to rising customer acquisition costs.

81.     In addition, as a member of the Audit Committee, Defendant Strawn knowingly or recklessly allowed the Company to avoid accounting for rising customer acquisition costs during the Relevant Time Period. Through the failure to adequately monitor the effectiveness of both the internal audit function and the independent registered public accounting firm providing auditing services, Defendant Strawn knowingly or recklessly allowed the misconduct described above to occur. Defendant Strawn knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Strawn breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Strawn faces a substantial likelihood of liability for these breaches, making any demand on Defendant Strawn futile.

### C.     Demand is Excused as to Defendant DiTrolio

82.     Defendant DiTrolio served as a director of the Company during the Relevant Time Period. As a director, Defendant DiTrolio had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant DiTrolio was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

83.     Defendant DiTrolio failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor LifeMD's controls, Defendant DiTrolio failed to protect corporate assets.

84.     According to the Proxy, Defendant DiTrolio received $212,801.00 in compensation in connection with his role as a Company director. Accordingly, Defendant DiTrolio cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

85.     Defendant DiTrolio faces a substantial likelihood of liability for these breaches, making any demand on Defendant DiTrolio futile.

### D.     Demand is Excused as to Defendant Simon

86.     Defendant Simon served as a director of the Company during the Relevant Time Period. As a director, Defendant Simon had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Simon was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

87.     Defendant Strawn failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor LifeMD's controls, Defendant Simon failed to protect corporate assets.

88.     According to the Proxy, Defendant Simon received $451,902.00 in compensation in connection with his role as a Company director. Accordingly, Defendant Simon cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

89.     Defendant Simon served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving LifeMD's Forms 10-Q and 10-K filed during the Relevant Period. Defendant Simon was thus responsible for knowingly or recklessly allowing the improper statements related to rising customer acquisition costs.

90.     In addition, as a member of the Audit Committee, Defendant Simon knowingly or recklessly allowed the Company to avoid accounting for rising customer acquisition costs during the Relevant Time Period. Through the failure to adequately monitor the effectiveness of both the internal audit function and the independent registered public accounting firm providing auditing services, Defendant Simon knowingly or recklessly allowed the misconduct described above to occur. Defendant Simon knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Simon breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Simon faces a substantial likelihood of liability for these breaches, making any demand on Defendant Simon futile.

### E.    Demand is Excused as to Defendant LaRovere

91.    Defendant LaRovere served as a director of the Company during the Relevant Time Period. As a director, Defendant LaRovere had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant LaRovere was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

92.    Defendant Strawn failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor LifeMD's controls, Defendant LaRovere failed to protect corporate assets.

93.    According to the Proxy, Defendant LaRovere received $92,812.00 in compensation in connection with his role as a Company director. Accordingly, Defendant LaRovere cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

94.    Defendant LaRovere served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving LifeMD's Forms 10-Q and 10-K filed during the Relevant Period. Defendant LaRovere was thus responsible for knowingly or recklessly allowing the improper statements related to rising customer acquisition costs.

95.    In addition, as a member of the Audit Committee, Defendant LaRovere knowingly or recklessly allowed the Company to avoid accounting for rising customer acquisition costs during the Relevant Time Period. Through the failure to adequately monitor the effectiveness of

both the internal audit function and the independent registered public accounting firm providing auditing services, Defendant LaRovere knowingly or recklessly allowed the misconduct described above to occur. Defendant LaRovere knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant LaRovere breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant LaRovere faces a substantial likelihood of liability for these breaches, making any demand on Defendant LaRovere futile.

**F.    Demand is Excused as to Defendant Febbo**

96.    Defendant Febbo served as a director of the Company during the Relevant Time Period. As a director, Defendant Febbo had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Febbo was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

97.    Defendant DiTrolio failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor LifeMD's controls, Defendant Febbo failed to protect corporate assets.

98.    Defendant Febbo faces a substantial likelihood of liability for these breaches, making any demand on Defendant Febbo futile.

**G.    Demand is Excused as to Defendant MacRae**

99.    Defendant MacRae served as a director of the Company during the Relevant Time Period. As a director, Defendant MacRae had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations,

prospects, internal controls, and financial statements were accurate. Defendant MacRae was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

100. Defendant DiTrolio failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor LifeMD's controls, Defendant MacRae failed to protect corporate assets.

101. According to the Proxy, Defendant MacRae received $197,175.00 in compensation in connection with his role as a Company director. Accordingly, Defendant MacRae cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

102. Defendant MacRae faces a substantial likelihood of liability for these breaches, making any demand on Defendant MacRae futile.

103. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

104. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

105. Each of the Director Defendants owed and owes LifeMD the highest obligations of loyalty, good faith, due care, and oversight.

106.    Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

107.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

108.    In addition, the Director Defendants further breached their fiduciary duties owed to LifeMD by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations as follows: (1) Defendants materially overstated LifeMD's competitive position; (2) Defendants were reckless in raising LifeMD's 2025 guidance because they had not properly accounted for rising customer acquisition costs in LifeMD's RexMD segment, as well as for its sales of GPL-1 weight loss mediactions; and therefore, (3) Defendants' statements about LifeMD's business, operations, and prospects were materially false and misleading.

109.    The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

110.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately

maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

111.    As a direct and proximate result of the breaches of duty alleged herein, LifeMD has sustained and will sustain significant damages.

112.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

113.    Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

### COUNT II

### Breach of Fiduciary Duty
### (Derivatively Against the Officer Defendants)

114.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

115.    The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe LifeMD the highest obligations of loyalty, good faith, due care, oversight, and candor.

116.    The Officer Defendants breached their fiduciary duties owed to LifeMD by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, specifically (1) Defendants materially overstated LifeMD's competitive position; (2) Defendants were reckless in raising LifeMD's 2025 guidance because they had not properly accounted for rising customer acquisition costs in LifeMD's RexMD

segment, as well as for its sales of GPL-1 weight loss mediactions; and therefore, (3) Defendants' statements about LifeMD's business, operations, and prospects were materially false and misleading.

117.    The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

118.    As a direct and proximate result of the breaches of duty alleged herein, LifeMD has sustained and will sustain significant damages.

119.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

120.    Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## COUNT III

### Gross Mismanagement
### (Against All Defendants)

121.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

122.    By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

123.    As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

124.    As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, LifeMD has sustained and will sustain significant damages.

125.     As a result of the misconduct alleged herein, the Defendants are liable to the Company.

126.     Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Derivatively Against All Defendants)

127.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

128.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

129.     As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

130.     As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, LifeMD has sustained significant damages.

131.     As a result of the misconduct alleged herein, the Defendants are liable to the Company.

132.     Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### (Derivatively Against the Officer Defendants)

133.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

134.    By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

135.    The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

136.    Plaintiff, on behalf of LifeMD, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

### COUNT VI
### Violation of Section 14(a) of the Exchange Act
### (Against The Director Defendants)

137.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

138.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege

and do not sound in fraud. Plaintiff specifically disclaims any allegation of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

139.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy. In the Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

140.    The Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, LifeMD misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

141.    Plaintiff, on behalf of LifeMD, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the Director Defendants to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of LifeMD and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all of the Defendants and in favor of LifeMD for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.      Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.      Awarding LifeMD restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 10, 2025                    **ROWLEY LAW PLLC**

*S/ Shane T. Rowley*

Shane T. Rowley (SR0740)
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
Email: drl@rowleylawpllc.com

*Attorneys for Plaintiff*